Edward W. Swanson, SBN 159859
ed@smllp.law
Britt Evangelist, SBN 260457
britt@smllp.law
SWANSON & McNAMARA LLP
300 Montgomery Street, Suite 1100
San Francisco, California 94104
Telephone: (415) 477-3800
Facsimile: (415) 477-9010

Attorneys for Defendant NORMAN MONTALVO

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                    Plaintiff,<br><br>     vs.<br><br>NORMAN MONTALVO,<br><br>                    Defendant. | Case No. CR 12-00785 CRB<br><br>**DEFENDANT NORMAN MONTALVO'S SENTENCING MEMORANDUM AND MOTION FOR VARIANCE PURSUANT TO 18 U.S.C. § 3553**<br><br>Sentencing Hearing: TBD (status appearance on April 26, 3018)<br>Time: 1:30 p.m.<br>Court: Hon. Charles R. Breyer |

/ / /

/ / /

## I. INTRODUCTION

Mr. Norman Montalvo's life has been characterized by working hard to support his wife and five children and giving selflessly to others in need. That was true before he got involved in the bid-rigging scheme, and it has been true for the five and a half years since he was charged. After being indicted, Mr. Montalvo immediately began cooperating with the government, provided substantial assistance through multiple proffer sessions, and promptly pled guilty. A term of incarceration is not necessary to deter future criminal conduct by Mr. Montalvo or others or to protect the public.

In its Presentence Report ("PSR"), the Probation Office recommends a probationary sentence of 3 years, including a 6-month term of home confinement. The recommendation includes a downward variance from the Guidelines range of 12 to 18 months custody on the basis of Mr. Montalvo's 18 U.S.C. § 3553(a) factors and the need to avoid unwarranted sentencing disparity.

The Probation Office's recommendation does not account for Mr. Montalvo's cooperation. Undersigned counsel understands the government will be making a motion under U.S.S.G. § 5K1.1 to reduce Mr. Montalvo's sentence by 40% from the low end of the Guidelines and recommending the resulting sentence of seven months custody. The government's recommendation, however, does not account for any of the § 3553(a) factors, including those identified by the Probation Office in support of its recommended downward variance.

The proper sentence for Mr. Montalvo should account for his cooperation, his individual characteristics and the other factors under § 3553(a), as well as the many other sentences imposed in related cases. Counsel submits this memorandum to request that the Court impose a

2

probationary sentence that includes four months of home detention with electronic monitoring. This sentence takes into account the Probation Office's proposed downward variance, and it also factors in the government's anticipated § 5K1.1 motion by reducing by 40% the Probation Office's proposed term of 6 months home confinement.

## II.     THE PRESENTENCE REPORT

Mr. Montalvo agrees with the Guidelines calculation in the PSR and has no objection to the restitution amount recommended by the Probation Office.

### A.     Sentencing Recommendation

The Probation Office recommends a sentence of 3 years probation, representing a 12-month downward variance from the applicable Guidelines range of 12 to 18 months, as well as a $40,000 fine. Sentencing Recommendation ("Sent. Rec."), pg. 1. The Probation Office bases its downward variance recommendation on: (1) the circumstances of Mr. Montalvo's childhood, during which his alcoholic father abandoned the family and Mr. Montalvo took on financial and other responsibilities to assist his mother; (2) the fact that he is the sole provider for his wife and children; and (3) that Mr. Montalvo and his wife care for her elderly, disabled mother. *Id*. at 2. In addition, the Probation Officer notes that imposing a term of custody on Mr. Montalvo would result in unwarranted sentencing disparity, as several "similarly situated defendants received location monitoring in lieu of such a sentence." *Id*. The Probation Office's sentencing recommendation does not account for any departure under a § 5K1.1 motion by the government. *Id*. As discussed further below, Mr. Montalvo agrees that a downward variance is warranted but submits that after taking into account all of the § 3553(a) factors, the probationary sentences received by other cooperating, similarly-situated defendants, and the government's anticipated §

5K1.1 motion, a non-custodial sentence with four months of home detention and a $4,000 fine are appropriate.

### B.   Probationary Conditions

Mr. Montalvo requests that the Court modify or strike four of the conditions of probation recommended by the Probation Office.

Special Condition number one restricts Mr. Montalvo's work-related travel during his term of home confinement to the Northern District and Eastern District of California.  Because Mr. Montalvo's work often requires him to travel to Southern California, he requests that Special Condition number one be modified to allow him to travel to the Central District of California for work as well.

Special Condition number six prohibits Mr. Montalvo from incurring new debt or opening new lines of credit without the prior permission of his Probation Officer.  Mr. Montalvo recognizes that condition number six is typically imposed where the defendant has been ordered to pay restitution or a fine (*see* U.S.S.G. § 5D1.3(d)(2)), as he will be so ordered here.  However, Mr. Montalvo's work periodically includes real estate investment deals, which typically require him to incur debt.  Given the nature of Mr. Montalvo's work, he requests that the Court strike Special Condition number six.  Mr. Montalvo notes that Special Condition number five already requires him to provide the Probation Officer with full access to his financial information, and he has no objection to that condition.  Alternatively, after Mr. Montalvo pays his restitution and fine, this condition should expire.

Special Condition number seven prohibits Mr. Montalvo from having contact with a number of his co-defendants.  Mr. Montalvo requests that the Court modify this condition to allow Mr. Montalvo to have contact with two of those defendants – Mr. Joseph Giraudo and Mr.

Raymond Grinsell. Mr. Montalvo socializes with Mr. Giraudo and Mr. Grisnell and is currently involved in a real estate project with Mr. Giraudo. Mr. Montalvo has no objection to the Court ordering him to have no contact with these co-defendants regarding case-related matters.

Mr. Montalvo objects to Special Condition number three, which requires him to abstain from alcohol use, as not reasonably related to the sentencing factors as required by 18 U.S.C. § 3563(b). In addition, this condition is not supported by the record of the offense in this case and thus imposes a deprivation of liberty greater than is reasonably necessary to achieve the goals of sentencing. 18 U.S.C. § 3563(b). The condition does not bear any relationship to the nature of the offense of bid-rigging and there is no indication in the record that alcohol abuse contributed to the offense conduct in any manner. *See United States v. Napier*, 463 F.3d 1040, 1044–45 (9th Cir. 2006) (drug treatment condition inappropriate where defendant was "convicted of defrauding the federal government, and there is no evidence of drug abuse bearing any relation to the fraud" and the only evidence of substance abuse in the record was a 20-year-old conviction for selling cocaine); *United States v. Prendergast*, 979 F.2d 1289, 1293 (8th Cir. 1992) (alcohol condition inappropriate where "[t]here is no evidence indicating that Prendergast suffers from alcoholism or that the use of alcohol in any way contributed to the commission of the offense for which he was sentenced").[1]

### C.  Factual Corrections

Mr. Montalvo asks that three factual issues be clarified or corrected in the PSR, none of which have a direct effect on the Guidelines calculation. First, paragraph 53 should be modified

---

[1] Mr. Montalvo has no objection to Special Condition number two, which requires him to undergo testing and treatment for alcohol abuse if deemed necessary by the Probation Officer. While Mr. Montalvo does not have an alcohol problem and believes his Probation Officer will not deem treatment necessary, he has no objection to being evaluated and will fully participate in any prescribed treatment program.

to read that all of Mr. Montalvo's five children live at home except his son Armando. The Probation Office's Sentencing Recommendation also contains two factual errors. Page one of the Sentencing Recommendation should say that Mr. Montalvo's prior conviction for reckless driving occurred 35, not 20, years ago. Page two of the Sentencing Recommendation should state that Mr. Montalvo had a prior conviction for reckless driving, not a DUI.

## III. SENTENCING RECOMMENDATION

### A. The Nature of the Offense and the History and Characteristics of the Defendant (Section 3553(a)(1))

#### 1. The Nature of the Offense and Mr. Montalvo's Substantial Assistance

Mr. Montalvo had no involvement in the planning or creation of the scheme at issue. Mr. Montalvo has worked in the real estate industry since 1989, and it has been his full-time occupation since 2007. PSR, 62-64. His involvement in criminal activity occurred only after he formed KOR, Inc., with his partners (and now co-defendants), Mohammed Rezaian and Michael Renquist, the purpose of which was to purchase and flip foreclosed properties. *Id*. at 15. He participated in the criminal scheme from approximately June 2008 through April 2010 (*id*. at ¶ 14) and personally received $5,250 in kickback payments from the scheme. *Id*. at ¶ 21.

After his indictment in this case, Mr. Montalvo immediately began cooperating with the government. He proffered on two separate sessions with the government, produced documents that assisted with the government's case against other defendants, and provided all the information he had to offer. While the government is in the best position to inform the Court of the value of Mr. Montalvo's cooperation to their case, Mr. Montalvo notes that in briefing before the Court the government has already relied on his cooperation and prospective testimony. *See* Dkt. 236, United States' Response to Defendants' Post-Hearing Briefing, at 39 ("Moreover, the

**Defendant Norman Montalvo's Sentencing Memorandum**
*United States v. Montalvo*, CR 12-00785 CRB

prosecutors referenced the fact that eleven conspirators had already pled guilty and could implicate Rezaian and Rosenbledt. This included the prospective testimony from Montalvo, Rezaian's business partner, who described Rezaian as 'a source of payoffs,' a 'collector of payoffs,' and someone who 'negotiated payoffs' while Montalvo continued to bid."); *id* at 41 ("Indeed, as noted in the interview report of coconspirator Norm Montalvo: '[I]f the FBI took Rezaian's computer then the FBI had everything.'"); *see also* Dkt. 248, Order Denying Motion to Suppress Further Evidence as Fruit of the Poisonous Tree, at 5, 11 (mentioning that guilty plea of Norman Montalvo implicated defendants moving to suppress). Mr. Montalvo provided truthful, complete and reliable information that assisted the government at a time when this prosecution was in its infancy. See U.S.S.G. § 5K1.1 (factor (2), regarding "the truthfulness, completeness, and reliability of any information . . . provided by the defendant" and factor (5), regarding "the timeliness of the defendant's assistance").

### 2. The History and Characteristics of the Defendant

The criminal conduct in this case, while serious, must be viewed in light of Mr. Montalvo's otherwise relatively crime-free life history. Aside from two reckless driving convictions, one from 35 years ago (PSR ¶ 38-39), this is Mr. Montalvo's first encounter with the criminal justice system. Throughout his life, Mr. Montalvo has demonstrated a commitment to supporting his family, working hard for every penny he earns, and helping those in need (including strangers) whenever possible.

From a young age, Mr. Montalvo shouldered some of the financial responsibility for his family. Mr. Montalvo and his four siblings were primarily raised by their mother, because when Mr. Montalvo was 12 years old his father, an alcoholic prone to going on long, drunken binges, abandoned the family and returned to his home country of El Salvador. PSR, ¶ 47. Mr.

Montalvo at age 12 began to work to help support the family, and took on responsibility for caring for his younger siblings to assist his mother.  PSR, ¶ 49; Sent. Rec., 2.

As an adult, he married his college sweetheart, Teresita Montalvo (née Alacron), and the two had five children, four of whom continue to reside at the family home.  PSR, ¶¶ 50, 53.  Mr. Montalvo is the primary financial provider for his family.  PSR, ¶ 52, ¶ 65.  He has been a success in the real estate industry both before and after the offense conduct.  Many of the letters submitted to the Court attest to Mr. Montalvo's tireless work to support his family.  Declaration of Britt Evangelist ("Evangelist Decl."), **Ex. A**, at 2 (Mr. Montalvo's sister describing him as a "loving family man and [ ] extremely committed to working long hours to provide for his family"); *id*. at 6 (Mr. Montalvo's son recounting how his father "works to the bone to make ends meet and provide for his loved ones, all while taking care of the people around him in order to work another day").

Those same letters speak to how Mr. Montalvo also used his skills and training as a real estate agent and broker to assist those in need.  Before and after the financial and housing crisis, Mr. Montalvo helped many people avoid foreclosure by modifying or refinancing their loans to achieve monthly mortgage amounts they could afford.  Mr. Montalvo, for little or no charge, would review the homeowner's loan documents and identify issues, such as predatory lending practices or conditions not being followed by the lender, that he could use as leverage to renegotiate the terms of the homeowner's loan.  In his letter, Mr. Miguel G. del Barco recounts his experience as young real estate agent being mentored by Mr. Montalvo: "[D]uring the mortgage crisis, Mr. Montalvo helped many homeowner clients obtain loan modifications – a complex, time consuming process.  He would not charge a fee to his clients for successfully negotiating a loan modification with lenders."  **Ex. A**, at 1.  A client of Mr. Montalvo's, Mr.

Eduardo Sosa, describes how Mr. Montalvo helped him through the loan modification process and saved his home from foreclosure:

> Now unemployed, the bills began to pile up along with my mortgage payments. I soon found my house in foreclosure. After several attempts to find financial assistance with no avail, I found myself in abysmal hardship. . . It was then that I miraculously came across Norman Montalvo. I told him about my situation and he agreed to meet up with me to discuss it further. . . . The day my remodification acceptance letter came in I felt as if all the storm clouds that were hovering over me had just disappeared. For the first time in a while I was able to lift my head up and lout out a sigh of relief. I immediately picked up the phone called Norman to thank and praise him for guiding me to shore.

**Ex. A**, at 12.

Mr. Montalvo's friends and family describe meeting Mr. Montalvo's grateful clients who thanked him profusely for his assistance and generosity. Armando Montalvo describes meeting a man whose home Mr. Montalvo had saved from foreclosure and being confused about why his father would help the man for free. Mr. Montalvo explained to his son "it was more important for him to try and help this family stay off the streets then it was to make a profit and benefit off someone that was in a time of need." *Id*. at 4; *see also id*. at 6 (Norman Montalvo, Jr. letter: "On numerous occasions, he's willingly given his time and potential/entire earnings from a job to save someones home or livelihood. I cannot count the times I've had people approach me at events, gatherings, and random encounters to praise my father and to thank him for all of his efforts."); *id*. at 3 (Jesus Gomez letter: "I also know he has helped many people with Real Estate maters without charging or expecting a fee. In some instances, poor and desperate individuals have been able to save their homes"). Thus, while Mr. Montalvo has worked hard to support and provide for his family as a real estate broker, he is not a man motivated by a desire to accumulate wealth. Instead, as Mr. del Barco puts it in his letter to the Court, Mr. Montalvo has always seen

9

**Defendant Norman Montalvo's Sentencing Memorandum**
*United States v. Montalvo*, CR 12-00785 CRB

a "humanistic side of the [real estate] business" and always reminded him "to not concern myself so much with the dollars that can be earned in real estate, but to focus on helping people, which will be as rewarding." **Ex. A**, at 1.

Mr. Montalvo's generosity and selflessness are also manifested in other areas of his life. The small acts of kindness and charity recounted in the letters to the Court provide the best insight into the character of Mr. Montalvo. For example, Mr. del Barco recalls one instance where Mr. Montalvo purchased a week's worth of groceries for a family struggling during the financial crisis. *Id*. at 1. Likewise, Norman Montalvo Junior describes how during a family vacation to Mexico, Mr. Montalvo approached a mother with two young children who were sitting on the street. The children had no shoes. Mr. Montalvo spoke with the mother and then took them to a nearby store where he purchased shoes for the children. *Id*. at 6. Mr. Montalvo's sister-in-law recounts how he stepped in to protect a stranger, a patron of the San Francisco LGBT Center where she works, who was being harassed outside of the Center. *Id*. at 10. And Mr. Montalvo has not only opened his home to his 87-year-old mother-in-law, but he also converted his dining room into her bedroom, and to make her feel more at home, decorated it to be the "spitting image" of the bedroom she left behind. *See* PSR, ¶ 49; **Ex. A**, at 10.

Given the generosity Mr. Montalvo has shown to strangers and his extended family, it is perhaps no surprise that those who know him best describe him as a wonderful father and husband. Nearly every letter submitted to the Court describes Mr. Montalvo's devotion to his children and wife. *See*, *e.g*., **Ex. A**, at 2 (describing Mr. Montalvo as a brother "who is extremely kind, generous, loyal, true to his word" and as a "loving family man" who "is guiding his 4 sons and 1 daughter through life"); *id*. at 4-5 (Armando Montalvo stating his father is his role model and that "[w]ithout his support and life lessons, I would not be where I am today");

*id.* at 8 (Teresita Montalvo letter: "Norman is a wonderful and loving husband and an amazing father . . . He is very dedicated to our family and is a strong and supporting partner to me.")

In sum, Mr. Montalvo is fundamentally decent man. The rest of his life has been characterized by hard work and a commitment to helping others. Mr. Montalvo's criminal conduct in this case is simply inconsistent with who he has been and who he will be.

**B.     Need for the Sentence to Achieve the Goals of Sentencing (Section 3553(a)(2))**

The preventative goals of sentencing such as deterrence and public protection can be achieved without a custodial sentence. (18 U.S.C. § 3553(a)(2)(A)-(C)).

The letters submitted to the Court contain testimonials to the fact that Mr. Montalvo is a good person who made a terrible mistake, deeply regrets that mistake, and will not make a similar mistake in the future. *E.g.*, **Ex. A** at 3 ("I have great confidence in Norman; I know him as a good and honest god fearing man who is able to learn from his mistakes[.]"). Likewise, in his letter to the Court, Mr. Montalvo explains he is "deeply sorry and ashamed" for his actions, that he understands his actions incurred financial losses, and that he is prepared to pay for those losses. Evangelist Decl., **Ex. B** (Montalvo statement of acceptance). Mr. Montalvo's acceptance of responsibility can also be seen in how he responded to being contacted by the FBI about this case: Mr. Montalvo took the extraordinary step of immediately confessing his wrong doing to his sons. As Mr. Montalvo explains in his letter, he "told [his sons] the truth without sugar coating it" and "that [he] was going to take full responsibility for [his] actions[.]" It was important to him "to show them that when one makes the wrong choice one must own up to his actions and try to make things right." *Id*. Mr. Montalvo's immediate confession to his children demonstrates a high level of acceptance of responsibility that reflects directly on Mr. Montalvo's character and is further evidence he will not reoffend.

11

**Defendant Norman Montalvo's Sentencing Memorandum**
*United States v. Montalvo*, CR 12-00785 CRB

Nor will a probationary sentence leave Mr. Montalvo unpunished.  He will stand convicted of a serious federal felony and suffer the societal and other consequences such a conviction carries.  Indeed, after sentencing he will likely lose his real estate license and thus his ability to support his family through his chosen profession.  *See* Cal. Bus. & Prof. Code § 490(a) (California Bureau of Real Estate "may suspend or revoke a license on the ground that the licensee has been convicted of a crime, if the crime is substantially related to the qualifications, functions, or duties of the business or profession for which the license was issued.").  He will pay restitution and a fine.  As section 3553 provides, the punishment for a defendant should be just.  Here, Mr. Montalvo will be punished via the collateral consequences of this conviction.  Further punishment in the form of a term of incarceration is unnecessary.  Probation is a just sentence.

### C. The Need to Avoid Unwarranted Sentencing Disparity (§ 3553(a)(6))

The Probation Office concluded that imposing a term of custody on Mr. Montalvo would result in unwarranted sentencing disparity, "as several other cases already sentenced with similarly situated defendants received location monitoring in lieu of such a sentence." Sent. Rec. at 2.  Mr. Montalvo agrees.  Judge Hamilton has imposed probationary sentences on other defendants in the bid-rigging conspiracy who are similarly situated to or more culpable than Mr. Montalvo.  Most notably, Mr. Montalvo's former business partner, Michael Renquist, received a probationary sentence from Judge Hamilton despite the fact that he was responsible for a larger volume of commerce (nearly $6 million, compared to $4.3 million for Mr. Montalvo) and a larger restitution amount ($239,590, compared to $5,250 for Mr. Montalvo).  *See United States v. Michael Renquist*, No. CR. 13-00143 PJH; *see also*, *e.g.*, *United States v. Robert Kramer*, CR. 11-00423 PJH (sentenced to three years' probation, a $20,000 fine, and 10 months LMON, but where nearly triple the volume of commerce involved); *United States v. Peter McDonough*, CR.

13-00144 PJH (defendant with twice the volume of commerce who received over $300,000 in payoff sentenced to three years' probation, a $20,000 fine, and nine months LMON); *United States v. Charles Gonzales*, CR 14-00099 PJH (sentenced to three years' probation, a $20,000 fine, and eight months LMON, but where cooperation did not occur until August 2014, four years after being charged); *United States v. Douglas Ditmer*, CR. 12-00448 PJH (sentenced to three years' probation, a $20,000 fine, and $91,144 in restitution, where defendant initially denied involvement in bid rigging and destroyed bid rigging records).   In light of the sentences in these related cases and given Mr. Montalvo's comparable (or lesser) culpability and his cooperation, counsel submits that a probationary sentence with four months of home detention and electronic monitoring is sufficient but not greater than necessary to achieve the goals of sentencing and avoid unwarranted sentencing disparity.

### D.   The Court Should Impose a Fine of Four Thousand Dollars

The Probation Office recommends a fine of $40,000, an amount at the top end of the fine range agreed to by the parties in the Plea Agreement. Dkt. 48, ¶9.  Probation's recommendation is based on its conclusion that Mr. Montalvo can afford to pay a fine because he "has significant assets" and "a substantial cash flow." PSR, ¶ 66.  While the Probation Office is correct that at the present time Mr. Montalvo's monthly income and assets outpace his monthly expenses and liabilities, that may all soon change.  As noted above, Mr. Montalvo will likely lose his broker's license and with it his means for supporting his wife, her elderly mother, and his dependent children.  Although his wife is self-employed as an event planner, she is the primary caretaker for her elderly mother who also lives in the family home (PSR, ¶ 49), and her event planning business does not provide substantial financial support for the family; in 2016 the business grossed $4,231 but incurred a loss after accounting for expenses, and in 2017 the total earnings

for the business are estimated to be $9,600 (or $800 per month). Thus, following his conviction, Mr. Montalvo and his family may need to live off of what savings and assets they have accumulated for some unknown period of time.

In addition, from undersigned counsel's review of the dozens of defendants sentenced by Judge Hamilton in related cases, it appears the vast majority of the defendants received a fine of $20,000. In some instances, however, Judge Hamilton imposed fines of lesser amounts. Undersigned counsel did not attend the sentencing hearings for these defendants and does not know precisely why Judge Hamilton imposed lower fine amounts in those cases, but he notes that at least with regards to some of the cases, the defendants were real estate agents or brokers who stood to lose their license and their livelihood following their conviction. *United States v. Danli Liu*, CR. 12-611, Dkt. 41 at 9-10 ($5,000 fine imposed; defense counsel arguing that upon conviction her real estate license may be revoked, and she will "not be able to operate her business, which is her only means of support, aside from the child support"); *United States v. Gernot Zepernizk*, CR. 14-512 PJH, Dkt. 26 at 9 ($6,000 fine imposed; defense counsel arguing that "his felony sentence in this case will mean the loss of the realtor's license that has provided his livelihood"); *United States v. Rudolph Silva*, CR 14-00002 PJH, Dkt. 38 at 2 ($6,000 fine imposed; defense counsel mentioning defendant's real estate license).

Mr. Montalvo, therefore, submits that a $40,000 fine is excessive and asks the Court to impose a fine of $4,000, the bottom of the range stipulated to by the parties.

/ / /

14
**Defendant Norman Montalvo's Sentencing Memorandum**
*United States v. Montalvo*, CR 12-00785 CRB

## IV.     CONCLUSION

For the foregoing reasons, counsel respectfully requests the Court impose a sentence of probation with four months of home detention and electronic monitoring, as well as $5,250 in restitution and a fine of $4,000.

Dated: April 19, 2018                                  ____/s/_____
                                                                            Edward W. Swanson
                                                                            Britt Evangelist
                                                                            SWANSON & McNAMARA LLP
                                                                            Attorneys for NORMAN MONTALVO